Herman Weinkbantz, J.
The 40 defendants have ¡been charged with disorderly conduct, specifically, violating subdivision 2 of section 722, of the Penal Law, and all of them (except two) have additionally been charged with violating section 1851 of the Penal Law, “ resisting public officer in the discharge of his duty ’ ’. The defendant Rey Lefstedt is also additionally charged with violating section 1694 of the Penal Law, “ escaping prisoner,” and 1825 of the Penal Law, “ resisting executive officer. ’ ’ The defendant Anthony Distasi is charged additionally with assault third, and the defendant Frank Wise is charged additionally with felonious assault. The two not charged with violating section 1851 of the Penal Law are Diane Keenan, whose case has not been considered by the court, and Hector Ponce, who is however charged with assault third and subdivision 2 of section 1894-a of the Penal Law, ‘ ‘ to use or explode fireworks in public.”
*88 The cases are before the court for preliminary hearings on all the misdemeanors and the one felony; the disorderly conduct charges, being offenses, are not before the court at all and are not being tried at this time. It has been conceded, however, that in determining the pertinent issues in the misdemeanor and the felony charges, if the arrests were not made in accordance with law, then the resistance to the officers, if not unreasonable, and some of the other charges, would thereupon not be violations of law. To ascertain all the facts the People have presented their side of the disorderly conduct charges so that the court could determine whether those arrests complied with the provisions of subdivision 1 of section 177 of the Code of Criminal Procedure, to wit: “For a crime, committed or attempted in his presence, or where a police officer * * * has reasonable grounds for believing that a crime is being committed in his presence.”
All of the witnesses called to the stand were police officers and a Parks Department foreman. From their testimony it seems clear that on May 30, 1967, a clear, sunny day, a holiday, a Parks Department foreman was on duty in Tompkins Square Park on the lower east side of Manhattan. He knew that a permit had been issued for a group or groups to gather in the bandstand area that day and to play musical instruments. That permit called for a crowd of up to 6,000 people, and he, the foreman, knew that the bandshell, the stands, and the mall area could not accommodate so large a crowd. With a permit issued for a crowd of up to 6,000, he, the foreman, had provided benches for 100 people. Where were the defendants then to go, other than on the grass 1 As the day progressed, he saw a crowd of three to four hundred people on the grass in the fenced-in area. Six adults complained to him about noise and four children complained that they could not get on Hoving Hill (a sandpile). Incidentally, this foreman could not identify any of the defendants. There was one police officer on duty in the park and the Parks Department foreman went to the local precinct police station for police reinforcements.
A police sergeant with another police officer then came to the park, arriving at about 5:15 p.m., by which time the Parks Department foreman had already gone home. About six people complained to the sergeant about noise. He heard Bongo drums, guitars, cymbals, tom-toms, screaming and shouting. He saw 50 to 60 people in a group, on the grass, sitting down and playing. The sergeant described this as a “tense situation.” He stated that he “ got anxious.” At that time there were about 300 spectators in the park. The sergeant could *89 not get the defendants to desist or leave the park, and he called the Emergency Service Division and sent a signal 1041 which is an emergency signal for additional radio cars. After the radio cars arrived, there were 1,200 to 1,400 people in the area; more police arrived until there were 100 police officers in response to the sergeant’s call for aid.
After the arrival of the radio cars the arrests were made. Except for the arrests made by Detective James J. Robert, the arrests were made at the direction of the sergeant and were for violation of Parks Department rules and regulations and the defendants were so booked. No such charge, however, has been filed or prosecuted, nor is any such charge now before the court. As to any charges of violation of Parks Department rules and regulations, the record is clear and uncontradicted that a ranking Parks Department official met with the Parks Department foreman and told him not to prosecute for any such violation, and that, among other things, he did not think there were any such violations.
The disorderly conduct complaints were drawn in the court prior to the arraignment of the defendants. In all of them (except Detective Robert’s two cases) the Parks Department foreman is the complainant, this in spite of the fact that he was not even in the park when the arrests were made and in spite of his testimony that he could not identify any defendant. The court makes no comment herein about the fact that in at least four complaints involving 19 defendants the names of police officers have been typed over by a series of typewritten letter X’s and the Parks Department foreman’s name substituted therefor. This matter, however, cannot be ignored in reaching a decision herein.
If the complainant did not see the crimes for which the defendants were arrested on his complaint, then who did see them? The arrests for disorderly conduct made by the police officers were in the main for acts which had taken place before their arrival at the scene. The defendants were booked for violating Parks Department rules and regulations and the police were making the arrests on that charge only, with the Parks Department foreman as complainant. The complainant could not identify any defendant. In this series of contradictions, the disorderly conduct complaints are not only defective but there is also a complete failure to comply with the provisions of subdivision 1 of section 177 of the Code of Criminal Procedure.
In this connection it is not inappropriate to state that one officer testified that the sergeant told him to arrest five people. When asked by the court “ any five? ” his answer was “Yes, *90 any five.” Other officers testified that the sergeant said that the ‘£ people are to be arrested on complaint of the Parks Department foreman.” It must be stated at this point that-the police officers’ testimony as a whole has been entirely frank and forthright. While there are inconsistencies and contradictions in the record, this is quite natural and proves there was no collusion or organized effort to conceal or mislead.
It is quite clear from all the evidence that an anxious Parks Department employee demanded more police in the park. Before then no crime had been committed. More police arrived. No crime had yet been committed. A worried sergeant requested help and received perhaps more help than he had expected. No crime had yet been committed. When he requested help, his own testimony is that 50 or 60 people were in a group on the grass sitting down and playing. When more and more police arrived, the sergeant ordered arrests. These police did not even know what had been going on in the park before their arrival. They had not been there at all. They obeyed orders and made arrests. The defendants objected to being arrested and did not voluntarily leave or accompany the officers. As more officers arrived, they naturally assisted brother officers without inquiring or being told what was going on. Were it not for the timely arrival of the highest echelon police officials, this situation would have worsened materially.
True, the local police had a problem. The local, usual habitues of the park resented the invasion by this new group which is nonconforming, whose dress is bizarre, and whose conduct is unconventional. There is, however, no law against that nor is there any law granting exclusive use of a public park to any one group to the exclusion of others. This court will not deny the equal protection of the law to the unwashed, unshod, unkempt, and uninhibited. In protecting those rights, however, it wishes to make clear that other people also have the same rights, which these defendants too must respect.
Accordingly, I find that in none of the disorderly conduct complaints did the arresting officers have reasonable ground to believe that a crime was being committed in his presence. Hence, each charge of section 1851 of the Penal Law is dismissed. The section 1694 of the Penal Law, assault third, and section 1825 of the Penal Law charges against Bey Lefstedt are also dismissed, as is the assault third charge against Anthony Distasi and the felonious assault charge against Frank Wise. On the charges of assault third, subdivision 2 of 1894-a of the Penal Law and use of firecrackers against Hector Ponce, the motion *91 to dismiss is denied and that case will he .set down for trial in Part 2B of this court on a date to be fixed.
In finding as I do, I am convinced that the defendants were not at any time motivated by an intent to breach the peace. I am attempting also to avoid any technical problems which might delay justice in these cases, and I have gone into the facts fully so that, in the interests of justice, full and final disposition may be achieved thereby.
If I may paraphrase and also quote from the Court of Appeals in People v. Smith (19 N Y 2d 212, 216) —the conclusion I have reached is not to be construed as an expression of approval of the defendant’s conduct. ‘ ‘ Those whose duty it is to enforce the law often operate under difficult and trying circumstances. In performing that duty they are entitled to the co-operation of every citizen.”